UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LONDON

SEP 21

CIVIL ACTION NO. 05-414-GWU

KENNY GARRISON, PLAINTIFF,

VS. **MEMORANDUM OPINION**

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY, DEFENDANT.

### INTRODUCTION

The plaintiff brought this action to obtain judicial review of an administrative denial of his applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). The appeal is currently before the Court on cross-motions for summary judgment.

### APPLICABLE LAW

The Sixth Circuit Court of Appeals has set out the steps applicable to judicial review of Social Security disability benefit cases:

1. Is the claimant currently engaged in substantial gainful activity? If yes, the claimant is not disabled. If no, proceed to Step 2. See 20 C.F.R. 404.1520(b), 416.920(b).

2. Does the claimant have any medically determinable physical or mental impairment(s)? If yes, proceed to Step 3. If no, the claimant is not disabled. See 20 C.F.R. 404.1508, 416.908.

3. Does the claimant have any severe impairment(s)--i.e., any impairment(s) significantly limiting the claimant's physical or mental ability to do basic work activities? If yes, proceed to

1

       Step 4. If no, the claimant is not disabled. See 20 C.F.R. 404.1520(c), 404.1521, 416.920(c), 461.921.

4. Can the claimant's severe impairment(s) be expected to result in death or last for a continuous period of at least 12 months? If yes, proceed to Step 5. If no, the claimant is not disabled. See 20 C.F.R. 404.920(d), 416.920(d).

5. Does the claimant have any impairment or combination of impairments meeting or equaling in severity an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Listing of Impairments)? If yes, the claimant is disabled. If no, proceed to Step 6. See 20 C.F.R. 404.1520(d), 404.1526(a), 416.920(d), 416.926(a).

6. Can the claimant, despite his impairment(s), considering his residual functional capacity and the physical and mental demands of the work he has done in the past, still perform this kind of past relevant work? If yes, the claimant was not disabled. If no, proceed to Step 7. See 20 C.F.R. 404.1520(e), 416.920(e).

7. Can the claimant, despite his impairment(s), considering his residual functional capacity, age, education, and past work experience, do other work--i.e., any other substantial gainful activity which exists in the national economy? If yes, the claimant is not disabled. See 20 C.F.R. 404.1505(a), 404.1520(f)(1), 416.905(a), 416.920(f)(1).

Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984).

Applying this analysis, it must be remembered that the principles pertinent to the judicial review of administrative agency action apply. Review of the Commissioner's decision is limited in scope to determining whether the findings of fact made are supported by substantial evidence. Jones v. Secretary of Health and Human Services, 945 F.2d 1365, 1368-1369 (6th Cir. 1991). This "substantial

evidence" is "such evidence as a reasonable mind shall accept as adequate to support a conclusion;" it is based on the record as a whole and must take into account whatever in the record fairly detracts from its weight. Garner, 745 F.2d at 387.

One of the detracting factors in the administrative decision may be the fact that the Commissioner has improperly failed to accord greater weight to a treating physician than to a doctor to whom the plaintiff was sent for the purpose of gathering information against his disability claim. Bowie v. Secretary, 679 F.2d 654, 656 (6th Cir. 1982). This presumes, of course, that the treating physician's opinion is based on objective medical findings. Cf. Houston v. Secretary of Health and Human Services, 736 F.2d 365, 367 (6th Cir. 1984); King v. Heckler, 742 F.2d 968, 973 (6th Cir. 1984). Opinions of disability from a treating physician are binding on the trier of fact only if they are not contradicted by substantial evidence to the contrary. Hardaway v. Secretary, 823 F.2d 922 (6th Cir. 1987). These have long been well-settled principles within the Circuit. Jones, 945 F.2d at 1370.

Another point to keep in mind is the standard by which the Commissioner may assess allegations of pain. Consideration should be given to all the plaintiff's symptoms including pain, and the extent to which signs and findings confirm these symptoms. 20 C.F.R. Section 404.1529 (1991). However, in evaluating a claimant's allegations of disabling pain:

3

Garrison

> First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

Duncan v. Secretary of Health and Human Services, 801 F.2d 847, 853 (6th Cir. 1986).

Another issue concerns the effect of proof that an impairment may be remedied by treatment. The Sixth Circuit has held that such an impairment will not serve as a basis for the ultimate finding of disability. Harris v. Secretary of Health and Human Services, 756 F.2d 431, 436 n.2 (6th Cir. 1984). However, the same result does not follow if the record is devoid of any evidence that the plaintiff would have regained his residual capacity for work if he had followed his doctor's instructions to do something or if the instructions were merely recommendations. Id. Accord, Johnson v. Secretary of Health and Human Services, 794 F.2d 1106, 1113 (6th Cir. 1986).

In reviewing the record, the Court must work with the medical evidence before it, despite the plaintiff's claims that he was unable to afford extensive medical work-ups. Gooch v. Secretary of Health and Human Services, 833 F.2d 589, 592 (6th Cir. 1987). Further, a failure to seek treatment for a period of time may be a factor to be considered against the plaintiff, Hale v. Secretary of Health and Human Services, 816 F.2d 1078, 1082 (6th Cir. 1987), unless a claimant simply has no way to afford

4

Garrison

or obtain treatment to remedy his condition, McKnight v. Sullivan, 927 F.2d 241, 242 (6th Cir. 1990).

Additional information concerning the specific steps in the test is in order.

Step six refers to the ability to return to one's past relevant category of work. Studaway v. Secretary, 815 F.2d 1074, 1076 (6th Cir. 1987). The plaintiff is said to make out a prima facie case by proving that he or she is unable to return to work. Cf. Lashley v. Secretary of Health and Human Services, 708 F.2d 1048, 1053 (6th Cir. 1983). However, both 20 C.F.R. 416.965(a) and 20 C.F.R. 404.1563 provide that an individual with only off-and-on work experience is considered to have had no work experience at all. Thus, jobs held for only a brief tenure may not form the basis of the Commissioner's decision that the plaintiff has not made out its case. Id. at 1053.

Once the case is made, however, if the Commissioner has failed to properly prove that there is work in the national economy which the plaintiff can perform, then an award of benefits may, under certain circumstances, be had. E.g., Faucher v. Secretary of Health and Human Services, 17 F.3d 171 (6th Cir. 1994). One of the ways for the Commissioner to perform this task is through the use of the medical vocational guidelines which appear at 20 C.F.R. Part 404, Subpart P, Appendix 2 and analyze factors such as residual functional capacity, age, education and work experience.

5

One of the residual functional capacity levels used in the guidelines, called "light" level work, involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds; a job is listed in this category if it encompasses a great deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls; by definition, a person capable of this level of activity must have the ability to do substantially all these activities. 20 C.F.R. 404.1567(b). "Sedentary work" is defined as having the capacity to lift no more than ten pounds at a time and occasionally lift or carry small articles and an occasional amount of walking and standing. 20 C.F.R. 404.1567(a), 416.967(a).

However, when a claimant suffers from an impairment "that significantly diminishes his capacity to work, but does not manifest itself as a limitation on strength, for example, where a claimant suffers from a mental illness . . . manipulative restrictions . . . or heightened sensitivity to environmental contaminants . . . rote application of the grid [guidelines] is inappropriate . . ." Abbott v. Sullivan, 905 F.2d 918, 926 (6th Cir. 1990). If this non-exertional impairment is significant, the Commissioner may still use the rules as a framework for decision-making, 20 C.F.R. Part 404, Subpart P, Appendix 2, Rule 200.00(e); however, merely using the term "framework" in the text of the decision is insufficient, if a fair reading of the record reveals that the agency relied entirely on the grid. Ibid. In such cases, the agency may be required to consult a vocational specialist. Damron v. Secretary, 778 F.2d

6

279, 282 (6th Cir. 1985). Even then, substantial evidence to support the Commissioner's decision may be produced through reliance on this expert testimony only if the hypothetical question given to the expert accurately portrays the plaintiff's physical and mental impairments. Varley v. Secretary of Health and Human Services, 820 F.2d 777 (6th Cir. 1987).

## DISCUSSION

The plaintiff, Kenny Garrison, was found by an Administrative Law Judge (ALJ) to have "severe" impairments consisting of discogenic and degenerative disorders of the lumbar spine, a history of complaints of chronic bilateral ankle pain, a history of hypertension and non insulin-dependent diabetes mellitus (both controlled with medication), and major depressive disorder (recurrent, moderate). (Tr. 28). Nevertheless, the ALJ determined that the plaintiff retained the residual functional capacity to perform "light" level exertion that required no more than occasional climbing, balancing, stooping, kneeling, crouching, crawling, or pushing/pulling with the lower extremities, a need to avoid concentrated exposure to extreme cold and workplace hazards such as moving machinery and unprotected heights, and a limitation to routine, simple, and non-detailed tasks. (Tr. 28). The ALJ proceeded to apply Rule 202.20 of the Commissioner's Medical-Vocational Guidelines (the "grids") applicable to a person of the plaintiff's age of 33 years, high school education, and unskilled work experience, which directs a conclusion of "not

disabled." (Tr. 30-2). The Appeals Council declined to review, and this action followed.

As an initial matter, it is clear that the use of the grids in the presence of this number of non-exertional restrictions was improper. Social Security Ruling 85-15 states that "limitations in climbing and balancing have varying effects on the occupational base, depending on the degree of limitation and the type of job," and that while some limitation in climbing and balancing would not ordinarily have a significant impact on the broad world of work if it is the only limitation, in the present case, there clearly are many additional limitations. As such, a vocational expert should have been employed to determine the actual effect of these limitations on the occupational base. See also Abbott v. Sullivan, 905 F.2d 918, 927 (6th Cir. 1990); Kirk v. Secretary of Health and Human Services, 667 F.2d 624, 528 (6th Cir. 1983); Damron v. Secretary of Health and Human Services, 778 F.2d 279, 282 (6th Cir. 1985).

While a remand would be required on this basis even if the ALJ's functional capacity determination was supported by substantial evidence, the ALJ's rejection of treating physicians' opinions is not supported by substantial evidence.

The plaintiff alleged disability due to a back injury, anxiety, and depression, stemming from an original back injury in November, 1999 (Tr. 84, 416) but, because of an attempt to return to work, with restrictions, as a saw operator, amended his onset date to August 1, 2001 (Tr. 417).

Garrison

Opinions from medical sources about the plaintiff's physical functional capacity <u>after</u> the alleged onset date come from a treating physician, Dr. Paul Pedersen, a treating psychiatrist, Dr. S. Hayag, a one-time psychiatric examiner, Dr. Kevin Eggerman, and non-examining state agency reviewers who did not have access to all of the evidence and who never had the opportunity to see or comment upon the opinions of the treating physicians. The ALJ improperly rejected the opinions of Treating Sources Pedersen and Hayag because he felt that they were not sufficiently supported by objective evidence. (Tr. 27-8).

By way of background, a neurosurgeon, Dr. Steven Kiefer, treated Mr. Galloway for back pain early in 2000, prior to his amended onset date, and obtained an MRI showing protrusions at the L4-L5 and L5-S1 levels, associated with left leg pain and numbness. (Tr. 138-9). After physical therapy, Dr. Kiefer allowed the plaintiff to return to work in March, 2000, with restrictions on lifting no more than 35 pounds and no "repetitive" bending or twisting. (Tr. 135). Mr. Galloway had increased pain, and Dr. Kiefer briefly limited him to working only 5 hours a day, which he was able to tolerate; he was then cleared to resume working eight hours a day by May, 2000. (Tr. 130, 132). Although there were no further visits to Dr. Kiefer, the plaintiff reported to his treating family physician, Dr. Paul Pedersen, and his office staff, that he had considerable difficulty working full-time (Tr. 194-202). By July, 2001, Mr. Galloway reported to Dr. Pedersen that he had missed a considerable amount of work over the previous month due to increased lower back

9

pain with radiation, and the physician scheduled a new MRI. (Tr. 186). The MRI showed degenerative disc disease at L4-S1 with posterior displacement of the S1 nerve root. (Tr. 186, 396-7). It was at this point that Mr. Galloway stopped work, as reflected in the amended onset date.

Dr. Pedersen treated the plaintiff continuously, and office notes were submitted reflecting regular office visits through August, 2004. (Tr. 172-81, 349-52, 377-8). He obtained referrals to several specialists.

Dr. Rahul Dixit, a pain specialist, reviewed the MRI and conducted a physical examination showing forward flexion of the lumbar spine decreased 50 percent, along with painful extension and rotation but a non-focal neurological examination. He suggested a trial of three lumbar blocks, but warned that Mr. Galloway should not expect a "dramatic difference" due to the length of time since his original injury. (Tr. 140-1). Mr. Galloway testified that he did not have the shots due to the limited chance of success reported by the physician. (Tr. 429). He continued to report unchanged pain to Dr. Pedersen (Tr. 181-3). Due to new complaints of ankle pain, Dr. Pedersen referred his patient to Dr. Lisa DeGnore in November, 2002, who found few abnormalities of these joints on examination (Tr. 153-4). Her examination was limited to the ankles only, however. She recommended physical therapy, but the plaintiff was unable to get this treatment covered by worker's compensation. (Tr. 154, 172-3).

10

Garrison

Finally, Dr. Jaya Pampati examined Mr. Galloway in August, 2003 for complaints of generalized joint pain. (Tr. 164). She found erythematous areas on certain parts of the plaintiff's skin, mild to moderate midline tenderness of the lumbar spine, positive straight leg raising and Patrick's tests on the left, and a mild limitation in flexion and rotation. (Tr. 165).[1] Laboratory work showed a normal sedimentation rate, but a significantly positive HLAB-27 antigen (a reference for ankylosing spondylitis) (Tr. 210). Dr. Pampati assessed arthralgia with no definite evidence of acute or inflammatory arthritis, but prescribed the medication Clinoril. (Tr. 166). Dr. Pedersen later indicated that there was no improvement on this medication, and continued to find red and scaly spots on the plaintiff's skin. (Tr. 351-2). Further notes from late 2003 indicate that Mr. Galloway was seen for severe back pain in December after bending over to take clothes out of his dryer, and a registered nurse practitioner at Dr. Pedersen's office found tenderness across the low back, positive straight leg raising on the left at 15 degrees, and swelling across the lumbosacral area. (Tr. 350). By March, 2004, Mr. Galloway indicated that he was feeling shaky, and, after blood testing, Dr. Pedersen diagnosed Type II diabetes mellitus. (Tr. 349). Further treatment for low back pain and more physical therapy were undertaken in the summer of 2004. (Tr. 376-8).

---

[1] Patrick's test indicates arthritis of the hip. Dorland's Illustrated Medical Dictionary, 27th ed., p. 1688.

11

Garrison

Dr. Pedersen completed a physical medical assessment form on March 28, 2004, indicating that Mr. Galloway was able to lift a maximum of 40 pounds, 20 pounds occasionally, and 10 pounds frequently, could stand and walk a total of four hours in an eight-hour day (no more than 30 minutes without interruption), sit a total of four hours in an eight-hour day (no more than 30 minutes without interruption), could occasionally climb, balance, crouch, kneel, and crawl, should not push or pull more than 40 pounds, and was "unable to tolerate stressful environments" due to being under psychiatric care for depression and anxiety. (Tr. 390-3).

Although the ALJ summarized Mr. Galloway's physical treatment, noting that a number of tests were either negative or did not show remarkable abnormalities, albeit having evidence of disc bulges in the lumbosacral spine, he did not specifically reject Dr. Pedersen's assessment except for the limitations on sitting, standing, or walking for more than 30 minutes at a time because they were not supported by "significant clinical findings in his treatment records or by the neurological assessment of Dr. Kiefer"[2] or by a previous one-time examining source, Dr. James Templin, who had examined the plaintiff on September 28, 2000. (Tr. 29). Dr. Templin's report does not provide substantial evidence to discount the opinion of a treating source which was given almost four years later, particularly in view of the

---

[2]The ALJ was critical of the plaintiff for not having the shots or physical therapy recommended by the specialists, but the plaintiff appeared to have a reasonable basis for not having the treatment, as described above.

12

fact that Dr. Templin had limited the plaintiff to 25 pounds lifting, but lifting no weight either occasionally or frequently, standing or walking a total of three hours in an eight-hour day (no more than one-hour without interruption) and sitting six hours in an eight-hour day (one-hour without interruption), "never" performing any postural activities, having a limited ability to push and pull, a need to avoid temperature extremes and vibration, and a "seriously limited but not precluded" ability to deal with work stresses and maintain attention and concentration. (Tr. 403-5). Clearly, even if relevant to the plaintiff's condition four years later, Dr. Templin's sitting and standing restrictions alone are inconsistent with the ALJ's functional capacity finding, as are his limitations on postural activities. Dr. Kiefer also had not seen the plaintiff for approximately four years, and had not seen him for over one year prior to the amended onset date. By contrast, Dr. Pedersen <u>was</u> a treating source who had seen the plaintiff regularly between 2000 and 2004, had referred him to specialists, and had updated objective testing and personal examinations. He cited objective evidence in support of his opinion, including the August 14, 2001 MRI showing "lumbar degenerative disc disease with broad bulging at L4-L5 causing posterior displacement of S1 nerve roots bilaterally" and the positive HLAB 27 results.

    It is possible that the ALJ was following the May 28, 2003 opinion of a state agency reviewing source, Dr. John Rawlings (although his report was never cited by name), which was somewhat less restrictive than the ALJ's functional capacity finding. (Tr. 296-303). However, another state agency reviewer, Dr. S. Mukherjee,

13

Garrison

completed a residual functional capacity assessment on October 22, 2003, which limited the plaintiff to "light" level exertion and standing and walking "at least two hours" an eight-hour day, sitting about six hours, occasional pushing and pulling with the bilateral lower extremities, occasionally climbing, stooping, kneeling, crouching, and crawling, and having a need to avoid concentrated exposure to extreme cold and workplace hazards such as moving machinery and unprotected heights due to the side effects of pain medications. (Tr. 287-94). Dr. Mukherjee specifically stated that the previous assessment of Dr. Rawlings was not affirmed. (Tr. 294). Even the Rawlings restrictions, which included a restriction to light level exertion with occasional climbing, stooping, crawling, and avoidance of concentrated exposure to vibration and hazards, would be inconsistent with the use of the grid rules per SSR 85-15. Neither of the sources, as previously noted, had the benefit of the review of the entire record or commented on the reasons that their opinions would differ from the treating source. Barker v. Shalala, 40 F.3d 789, 794 (6th Cir. 1994). Therefore, even if it were possible to ignore the lack of discussion of the various sources in the ALJ's opinion, the state agency reviewers would not provide substantial evidence to overcome the opinion of the treating physician.

Much the same can be said of the ALJ's choice of mental restrictions. Mr. Galloway was treated at the Comprehensive Care Center (CCC) with visits to both the staff psychiatrist, Dr. Hayag, and outpatient counseling, beginning in approximately January, 2003. Dr. Hayag completed a treatment service plan on

14

Garrison

January 15, 2003 diagnosing moderate major depression, recurrent, with a Global Assessment of Functioning (GAF) score of 60, later somewhat reduced to 55-60. (Tr. 245-6, 256-7). GAF scores in this range reflect moderate difficulty in social, occupational, and school functioning. Diagnostic and Statistical Manual of Mental Disorders (Fourth Edition-Text Revision), p. 34. Dr. Hayag noted in March, 2003, that Mr. Galloway had been prescribed Prozac by Dr. Pedersen for a year without improvement, and had been referred by Dr. Pedersen for problems with anxiety attacks, irritability, a passive wish to die, and feelings of guilt about his son who had been newly diagnosed with depression. (Tr. 245). Dr. Hayag described the plaintiff's mood as depressed, with a congruent affect, and noted that he was trying to hold back tears during the interview. (Tr. 246). She changed his medication to Zoloft and, while this medication produced a "partial response" by September, 2003 in terms of feeling less depressed, Mr. Galloway still had problems with irritability, low frustration tolerance, poor concentration, easy fatigability, and poor sleep. (Tr. 225). Another medication was added. (Id.). Medications were changed again in November, 2003 because of panic attacks, depression, anhedonia, and low energy. (Tr. 347). The plaintiff's condition varied throughout 2004, with some improvement in depression by October, but with reports of increased anxiety. (Tr. 355).

Dr. Hayag's mental medical assessment form was completed in March, 2004, and stated that Mr. Galloway had a "seriously limited but not precluded" ability to deal with stresses, maintain attention and concentration, behave in an emotionally

15

Garrison

stable manner, and relate predictably in social situations. (Tr. 387-9). The reason given was depressive and anxiety symptoms affecting his functioning due to poor concentration, depressed mood, panic attacks, and anhedonia. (Tr. 389).

Dr. Eggerman, by contrast, examined Mr. Garrison on one occasion, June 11, 2003, and opined that he did not appear to be depressed, and, although Mr. Garrison was moderately anxious, Dr. Eggerman also felt that this was "somewhat embellished." (Tr. 155-8). He diagnosed an adjustment disorder with depressed mood, and no more than mild to moderate limitations in any area. (Tr. 159). State agency psychologists who reviewed the record in 2003 concluded that Mr. Garrison did not even have a "severe" mental impairment, stating that they gave Dr. Eggerman great weight. (Tr. 305, 320, 332). Neither they or Dr. Eggerman saw Dr. Hayag's conclusions, and, in contrast to Dr. Eggerman's statement that the plaintiff seemed anxious and not depressed, the ALJ appeared to accept Dr. Hayag's diagnosis of a major depressive disorder, which he found to be a "severe" impairment. While the Court agrees that Dr. Hayag's diagnosis was entitled to greater weight, the lack of functional restrictions is not supported by the treating psychiatrist or the treating family physician, Dr. Pedersen.[3] Given that both of the plaintiff's treating physicians agreed that he would have much greater mental

---

[3] The Court also notes that at several points in the hearing decision, the ALJ referred to Dr. Eggerman as "Dr. Maryman." (Tr. 24-6).

16

Garrison

limitations than found by the ALJ, at a minimum, the opinion of a medical expert who had the opportunity to review all the evidence should have been obtained.

The decision will be remanded for further consideration.

This the  21  day of September, 2006.

*signature*
G. WIX UNTHANK
SENIOR JUDGE

17